```
1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF MISSOURI
2                     SOUTHWESTERN DIVISION

3

   UNITED STATES OF AMERICA,      )
4                                 )
                 Plaintiff,       )  No. 14-05019-01-CR-SW-BP
5                                 )  January 14, 2016
            V.                    )  Springfield, Missouri
6                                 )  CRIMINAL
   JOHN MARK REIDLE,              )
7                                 )
                 Defendant.       )
8                                 )

9


10


                   TRANSCRIPT OF SENTENCING
11
             BEFORE THE HONORABLE BETH PHILLIPS
12              UNITED STATES DISTRICT JUDGE

13      Proceedings recorded by electronic stenography
                Transcript produced by computer
14


15                      APPEARANCES

16
   For Plaintiff:         MR. JAMES JOSEPH KELLEHER
17                        Assistant U.S. Attorney
                          901 St. Louis Street, Suite 500
18                        Springfield, MO 65806-2512

19 For Defendant:         MS. CELESTE K. JOHNS
                          Attorney at Law
20                        901 St. Louis Street, Suite 107
                          Springfield, MO 65806
21

22

23

24

25


                  Kathleen M. Wirt, RDR, CRR
                  United States Court Reporter
            400 E. 9th Street * Kansas City, MO 64106
                        816-512-5608
```

1    JANUARY 14, 2016

2    - - -

3    THE COURT:  Good morning.  We're here on Case

4  No. 14-5019.  Could counsel please enter their appearance?

5    MS. KELLEHER:  Jim Kelleher on behalf of the United

6  States, Your Honor.

7    THE COURT:  Thank you.

8    MS. JOHNS:  Celeste Johns on behalf of the

9  defendant, Your Honor.

10    THE COURT:  Thank you.  And Ms. Johns, does your

11  client pronounce his last name Reidle?

12    MS. JOHNS:  Yes, ma'am.

13    THE COURT:  Reidle.  Okay.  I wanted to make sure.

14    Mr. Reidle, we're here today, obviously, for a

15  sentencing, and I first have a few questions for you.  First of

16  all, I want to explain the steps we're going to be using during

17  today's sentencing.

18    The first step will be to have a conversation

19  regarding how to calculate the sentencing guidelines as they

20  apply to your case.  After I calculate the sentencing

21  guidelines, I will then ask the parties to provide any evidence

22  or argument they have regarding what they believe the

23  appropriate sentence is in your case.  Before I actually decide

24  the sentence, I will ask that you again stand, and I will give

25  you an opportunity to make a statement, if you wish, before I

1  actually impose the sentence.

2          Now, before I begin those three steps, I have a few

3  questions for you.  Have you had the opportunity to review the

4  presentence report?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Have you had the opportunity to discuss

7  it with your attorney?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Now, I know that you object to Paragraph

10 52 because you don't believe that you filed any tax returns on

11 that particular year.  With that exception, is there anything

12 else in the report that you think is wrong?

13         THE DEFENDANT:  No, Your Honor.

14         THE COURT:  Anything that you believe needs to be

15 changed?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  Okay.  Thank you.  You may be seated.

18         I will note for the record that the objection to

19 Paragraph 52 doesn't affect the calculation of the sentencing

20 guidelines and is not something that I will consider in my

21 sentence.

22         With that, Ms. Johns, do you have any other

23 objection to the presentence report?

24         MS. JOHNS:  No, ma'am.

25         THE COURT:  Thank you.  Mr. Kelleher, does the

1  government have any objection to the presentence report?

2         MS. KELLEHER:  No, Your Honor.

3         THE COURT:  In that case, I'll adopt the presentence

4  report.  I find a total offense level of 10, a Criminal History

5  Category of I, and a guideline range of 6 to 12 months in the

6  custody of the Bureau of Prisons.

7         With that calculation, Mr. Kelleher, does the

8  government have any evidence or argument regarding the

9  appropriate sentence in this case?

10        MS. KELLEHER:  Very brief argument, Your Honor.

11 It's very unusual for me to argue in favor of a sentence of

12 probation.  That almost never happens.  In a case like this

13 where the consequences of Mr. Reidle's crime resulted in

14 devastating results, it is even more difficult for me to make

15 this argument.

16        However, in fairness to Mr. Reidle, it was very

17 apparent from the outset of this case that the individual who

18 ultimately ended up with firearms that were purchased by Mr.

19 Reidle took advantage of him, took advantage of the friendship

20 between himself and Mr. Reidle, and took advantage of Mr.

21 Reidle's intellectual capabilities.

22        THE COURT:  I apologize.  I don't typically

23 interrupt during argument, but I need more evidence -- not

24 necessarily evidence.  I need more information from you as to

25 how you have come to that conclusion because that doesn't come

1  through to me in the presentence report.  And so can you share

2  with me what it is in the evidence that has caused the

3  government to conclude that Mr. Reidle was taken advantage of

4  by Mr. Cross?

5      MS. KELLEHER:  Yes, Your Honor.  Obviously, the

6  circumstances of this case were investigated quite thoroughly.

7  The two investigators, one from FBI and one from ATF, both of

8  whom are extraordinarily experienced investigators, Wes

9  Patterson and Jeff Atwood -- I believe Your Honor is at least

10 familiar with Wes Patterson -- met with Mr. Reidle at his home

11 within 24 to 48 hours of the incident in Kansas City.  They

12 spoke with Mr. Reidle.  I have a great deal of confidence that

13 if Mr. Reidle had been attempting to mislead those two

14 investigators, they would have -- he would have failed,

15 frankly.

16      I was informed of Mr. Reidle's level of functioning,

17 again, very early in the investigation.  From what I

18 understand, when Mr. Reidle became aware of the fact that the

19 guns that he purchased were used in the commission of this

20 horrific crime, he immediately checked himself into a

21 psychiatric facility.

22      There are aspects of Mr. Reidle's reaction to this

23 crime that simply could not be faked, certainly not

24 convincingly by a person with an eighth grade education, and

25 certainly not to the point where the investigators in this case

1  would have believed that Mr. Reidle had been bamboozled into

2  making these purchases.

3       In my mind, having limited contact with Mr. Reidle

4  in court, as well as speaking with my investigators who had

5  quite a bit more interaction with him, there's no question in

6  my mind that Mr. Reidle had absolutely no idea that these

7  weapons were going to be used for evil.  None.  And to be

8  perfectly honest, Your Honor, if I had even the smallest

9  indication that that were otherwise, I would be before the

10 Court asking for the maximum sentence in this case.

11      THE COURT:  Well, let me ask you this, then.  To me,

12 there's an argument to be made that we have these laws in place

13 to prohibit individuals like Mr. Cross from getting firearms,

14 and if you knowingly become a straw purchaser, you accept the

15 possibility that the person is taking advantage of you, that

16 the person is lying to you, and that the person is going to use

17 these to commit a horrible crime.

18      And so what's the government's response to the fact

19 that that's the whole reason we have straw purchaser laws?

20      MS. KELLEHER:  And certainly I understand that, Your

21 Honor.  And, again, there have been occasions where I have

22 been -- I have absolutely no problem recommending lengthy

23 sentences in these types of cases.

24      The difference in this case is that Mr. Cross took

25 Mr. Reidle to a Walmart.  He told him that he would like to

1  purchase a firearm for, I believe his nephew or a family member

2  for his birthday and that, unfortunately, he didn't have

3  identification on his person, but, if Mr. Reidle would make the

4  purchase, he would basically pay him back.

5        From what I gather from the presentence report,

6  they'd been friends for a long time.  I don't believe Mr.

7  Reidle was aware of the fact that Mr. Cross was a convicted

8  felon.  Quite frankly, there's no indication anywhere that Mr.

9  Reidle believed that Mr. Cross wanted to do anything other --

10  anything other than give this gun to his family member as a

11  birthday present.

12        THE COURT:  Well, I'm sorry to interrupt you again,

13  but they know each other from being acquainted from membership

14  in the KKK.

15        MS. KELLEHER:  And, again, it's not spelled out in

16  the presentence report, but the investigators went into that

17  part of Mr. Reidle's life in great detail.  From what I can

18  gather, Mr. Reidle was a part of that organization simply

19  because he had no friends.  He looked for friends wherever he

20  could.  I think the presentence report does indicate that his

21  involvement with that organization was restricted to placing

22  grave markers on the graves of confederate soldiers.

23        Again, Your Honor, having prosecuted white

24  supremacists in the past, Mr. Reidle is not the type of

25  individual I believe to have deeply held white supremacist

beliefs. There's simply no evidence of that.

I've done a fair amount of prosecution of individuals involved in the white supremacist movement. Mr. Reidle does not fit any of the characteristics that I've seen in those other investigations. There's not the degree of hatred, there's no evidence that he participated in any marches, there's no indication that he really did the types of things that would indicate that he is a hard-core member of the white supremacist movement.

And, again, Your Honor, if that were the case, I would have moved for detention at the earliest possible -- well, I would have filed a complaint and moved for detention, and I would have urged the Court to keep him in custody until this time. And, again, Your Honor, if I believed that he were involved in this organization in any meaningful way, I wouldn't be suggesting a sentence of probation.

And, again, there's -- there, frankly, isn't enough information in the presentence report to really give Your Honor the amount of information that, perhaps, you believe that is necessary. I can -- I can get in contact with the case agents, who might be able to give you a better idea of their thoughts with regard to Mr. Reidle's involvement in this.

But, again, I wouldn't be making the recommendations that I'm making unless, one, I was satisfied that Mr. Reidle had absolutely no idea of the danger that Mr. Cross presented

to society, that he believed anything other than this was a

birthday present, that he does suffer from intellectual

deficits, and that when he found out what transpired as a

result of that purchase, that he didn't express profound and

immediate regret to the point where he voluntarily checked

himself into a mental institution.

THE COURT:  Let me ask you one quick question.  I

don't want any -- I don't want too much emphasis placed on

this, but -- I'm not faulting the presentence report in any

way, shape, or form.  I think the nature of the evidence you're

relying on in order to make this recommendation is one that's

difficult to maybe objectively present in the limited form of a

presentence report.  And so what I'm trying to do is get --

grasp what it is about this case that has caused the government

to make this recommendation.

And so I am interested, are the case agents aware of

the nature of your recommendation?

MS. KELLEHER:  They are, Your Honor.

THE COURT:  And do they support that recommendation?

Not necessarily?

MR. KELLEHER:  I'm uncomfortable putting what I

believe -- what they thought should have happened on the record

because it --

THE COURT:  I don't say that because I put a lot of

emphasis on what case agents say.  Trust me.  I've told case

1    agents no more times than I care to recall.

2            I do think that we're relying so much on their

3    interaction with him to come to the conclusions you've drawn.

4    That's the only reason I'm interested in the case agents'

5    characterization of not only Mr. Reidle, but also this

6    particular crime.  I'm not really interested in whether or not

7    they support your recommendation.  I'm only interested in

8    whether or not their flavor of the circumstances are the same

9    as what you've provided.

10            MS. KELLEHER:  I will say this with regard to the

11   recommendations of the case agents and their feelings.  If

12   anything --

13            THE COURT:  I don't want to put you in a bad spot.

14   I probably shouldn't have asked the question, so let's just

15   take that question off the table.  Again, my reason for asking

16   the question is not a sincere interest in what their

17   recommendation is, it's more of a sincere interest in how they

18   view this case because we are relying so much on them.

19            Why don't I hear from Ms. Johns.  Ms. Johns, the

20   benefit -- well, I guess my cross-examine of Mr. Kelleher has

21   inured to your benefit because I don't have as many questions,

22   and I hope I've given you a sense of the concerns I have with

23   this case and some of the factors that weigh on my mind when

24   deciding what the appropriate sentence is.

25            So by any means -- by all means, make any argument

1   you wish, but to the extent that you can provide me information

2   that addresses the issues that I've raised, I do think that

3   would be helpful.

4         MS. JOHNS:  First I would go back to -- and I don't

5   know if the Court wants me to completely address 3553(a)

6   factors.  I can at this time, or just your issues?

7         THE COURT:  No, I'd like for you to make whatever

8   argument that you think is appropriate or necessary.

9         MS. JOHNS:  Thank you.  In terms of -- and I think

10   it goes hand in hand with some of the issues that Your Honor

11   raised.

12         The nature and circumstances of the offense.  First

13   of all, the other individual whose name is mentioned there in

14   Paragraph 5, first and foremost on Page 3 of the final PSR, I

15   have a little bit probably more personal knowledge of the

16   background and circumstances, given that I am from that same

17   hometown, Your Honor.

18         And I would note that in talking to folks in that

19   community, Mr. Frazier Glenn Cross, who is noted in

20   Paragraph 5, I had people tell me eight different names he was

21   known by:  Frazier Glenn Miller, Glenn Miller, Frazier Miller,

22   Frazier Cross.  The combinations just went on and on and on.

23         And I raise that for the purpose, Your Honor, of

24   going back to whether somebody in the community had -- or the

25   entire community or most of the community had notice that this

1  person was a prohibited individual in terms of the purchasing

2  of guns.  The individual moved to that community after those

3  circumstances had occurred is my understanding.  It did not

4  occur while he was a member of that community so that it would

5  become -- it would have become widely known that he was a

6  prohibited individual.  Those circumstances, to my

7  understanding, happened more than 15 to 20 years ago and, thus,

8  were possibly not as readily researchable if somebody had chose

9  to, let's say, you know, research every person they come in

10  contact with on the internet.

11        THE COURT:  I don't dispute that he didn't know.

12  I'm accepting that to be true.  I'm not even suggesting that he

13  had a responsibility to find out.  My point is we have these

14  laws to prevent this particular situation, and we have these

15  laws so that you are liable for that person that you are the

16  straw purchaser for.

17        So I will grant Mr. Reidle the assumption that he

18  had no idea who Mr. Cross was or what he was going to do with

19  this gun.

20        MS. JOHNS:  Thank you.  I would then note another

21  factor that I would raise.  This would be under the history and

22  characteristics of this defendant, and this is kind of

23  difficult for me to talk about because, I'm just going to be

24  frank, I don't want to hurt Mr. Reidle's feelings.

25        I was appointed almost immediately on this case by

1  the Court to represent him. He has been on pretrial release

2  for, I believe, more than 20 months. He has had absolutely no

3  violations that I have been made aware of, and I believe that's

4  also stated there on Page 3, Paragraph 4.

5          Twenty months, as Your Honor knows, is an extensive

6  period of time for someone to be on pretrial release, and

7  oftentimes defendants show their true colors when they are

8  allowed the mercy to be out on bond under conditions of

9  pretrial release. He has had absolutely no violations.

10          His interactions with me have been nothing but

11  respectful, professional, prompt. And so when I make this

12  statement, it pains me to do so. But I do concur with Mr.

13  Kelleher that my client was targeted because of possibly his

14  lack of intellectual ability, his true -- his too trusting of a

15  nature, his need for friends.

16          And if we look at his history there on Paragraph 47

17  of the final PSR on page 9, it delineates his educational,

18  vocational, and special skills. And, again, it was impossible

19  for myself and the probation office to get any official records

20  because, frankly, in trying to reach the school district and

21  obtain these, they were, I think, adverse to doing so because

22  what I was told -- Mr. Reidle's mother is in the courtroom and

23  his long-time companion. And what Mr. Reidle conveyed to me

24  is, is that he eventually dropped out in the middle of eighth

25  grade because the school encouraged him to. And not because of

1 any, you know, behavior problems, but because of their failure

2 back then.  I think the system is much different now in terms

3 of having individualized educational programs and so forth, IEP

4 programs, to help him and assist him with his special education

5 needs.

6 And so from that and speaking to those individuals,

7 I believe we're really talking about fruitful education through

8 the third grade in terms of that.  And I believe that the other

9 individual involved was very cunning and clever and basically

10 took advantage of that and took advantage of Mr. Reidle's

11 characteristics in that regard.

12 To that extent, do I believe that he lacked

13 capacity?  No, I'm not making that argument to the Court, but I

14 think there's different degrees in terms of that, beyond legal

15 capacity, that the Court could consider in understanding the

16 nature and circumstances of this offense.

17 I would also concur with, and did speak with the

18 case agents myself at the permission of Mr. Kelleher early on

19 in terms of, frankly, making the decision in terms of my

20 client's emotional state because, as Mr. Kelleher said, he did

21 check himself into a mental health facility immediately upon

22 notification of these events because he was in great distress

23 and, in terms, overwhelmed with grief.  And to this day, to

24 this day I think he would tell you in a moment he still feels

25 that way.

1       In terms of being truthful, immediately -- I was

2  told immediately, truthful.  Not a thing he has told the case

3  agents we have disputed, other than, and this was noted

4  correctly in the PSR, that he withdrew from the KKK

5  organization in 2003.  So that's quite a bit of time separating

6  that.  Did he still know this individual?  He did.  They lived

7  in very close proximity to each other in that same small

8  community area of Aurora and Marionville, Missouri.

9       And in terms of his immediate truthfulness to the

10  case agents, his immediate statements giving them every detail

11  he could possibly think of in regards to this purchase, this

12  was not a transfer of a firearm in a back alley or on

13  somebody's private property.  This was in the full view, as

14  everyone knows, at a Walmart store with a ton of cameras.  All

15  of this was on camera.  This wasn't something that Mr. Reidle

16  was trying to hide that he did, and didn't possibly understand

17  the depth of how wrong it was, as he does today.

18       But, again, I think it's important to note in

19  looking at that evidence that he wasn't trying to hide these

20  circumstances.  They happened at the spur of the moment.  The

21  other individual actually started making the purchase and then

22  proceeded to portray that he had simply just, oh, my gosh,

23  forgotten his identification.  And so in a matter of minutes,

24  this incident occurred.

25       And I don't say that to minimize the circumstances,

1 but to highlight such that it, I think, portrays a lack of

2 venal motive here on the part of my client, lack of intent in

3 terms of any further consequences, but did not give it enough

4 forethought.  And I believe that the other individual counted

5 on that, counted on those circumstances that I have just

6 outlined in terms of the characteristics of Mr. Reidle and the

7 circumstances.

8       In terms of other 3553(a) factors, I would note for

9 the Court, again, the offense was out in the open under camera

10 surveillance of a large store.  Also, like we said, as pointed

11 out immediately -- and this is in the PSR, as Your Honor

12 knows -- he has continued to be very distraught.  I think it's

13 also outlined in Paragraphs 42 through 44 of the final PSR that

14 Mr. Reidle has continued to seek mental health assistance.  He

15 is under the care of psychologist.  He has a caseworker, has

16 been assigned a caseworker by the Missouri Division of Social

17 Services that periodically picks him up, takes him to his

18 counseling appointments, and so forth.

19       He also has had physical conditions manifested due

20 to this.  I would -- and I know my client in talking with him

21 does not want me to necessarily minimize his taking

22 responsibility at all.  He has from day one taken full

23 responsibility.  He has not tried to detract from that one bit.

24 Not in making our plea agreement with the government, not in

25 accepting the plea agreement at his change of plea hearing, and

1   I don't think you will hear him do that today.

2           I think he understands that there's also a need for

3   proper knowledge of laws and boundaries in society and trusting

4   the right folks and getting that information when need be.

5   After these circumstances, Mr. Reidle has -- in terms of the

6   folks that he interacts with, has tightened that circle very,

7   very tight.

8           His mistrust of just others is very heightened,

9   which I don't blame him.  Basically, the three people that he

10  now trusts in the entire world are sitting here in the

11  courtroom, Your Honor:  his long-time companion and significant

12  other, who is noted in the PSR who lives in his home; Miss

13  Lillian Lawson, his mother; and one of his siblings is here

14  today.  That is, I think, the amount of trust that he has at

15  this point in others.

16          I would also note, though, that in terms of in his

17  history, he is a Criminal History Category I.  There were items

18  in the PSR for more than, I believe, twenty years ago.  His

19  recent history in terms of criminal history is none before

20  this.

21          Again, I do believe the more than 20 months that he

22  has been on pretrial release -- which I would note is not our

23  doing, Your Honor.  I think you can see, we did ask for a

24  motion for continuance at one point, but that was because we

25  were asked to in order to facilitate the fact that Mr. Reidle

1  also volunteered and was placed on the witness list for the

2  State of Kansas proceedings against Mr. Cross, or Mr. Miller,

3  however you want to reference him.  So that case took some time

4  to resolve.

5          At each juncture that that case has been in the

6  media, every single time, Mr. Reidle receives nasty,

7  threatening phone calls from all over the country.  We've given

8  the phone numbers to the government from basically, mainly

9  folks in support of the other person that's noted in the PSR,

10 and they were angry with Mr. Reidle for -- people he didn't

11 know at all, never met, never heard of, anything, just that he

12 was on the witness list, willing to testify against him.  And

13 he has wanted to do that from day one.  Prior to any plea

14 agreement, his name was on that witness list.

15         There is not a 5K1 motion by the government, but I

16 believe, as Your Honor knows, the Eighth Circuit has ruled in

17 various cases, including United States v. Reynolds that a

18 defendant's cooperation with the government can be taken into

19 consideration as a 3553(a) factor in terms of their history and

20 characteristics, even when a 5K1.1 motion is absent by the

21 government.  So we would also ask the Court to note that when

22 considering what would constitute a reasonable sentence for

23 this defendant.

24         We also believe that his good behavior while on

25 pretrial release is a huge factor in terms of a sentence no

greater than necessary to protect the public from further

crimes. We believe that a period of probation with whatever

restrictions this Court would impose, home confinement,

whatever would go along with that status, would be sufficient

due to these considerations.

The client -- or my client, as noted in the PSR, is

currently under both mental health and physical medical care.

We would also note that it would be better served if he could

continue with those same physicians and on the path he is now

and that he has done so well on for the past 20 months in that

regard.

I believe, as my client will say in a moment,

that -- he's also instructed me not to ask the Court for any

specific length of probation. As he will state to the Court in

a moment, I think he's willing to accept any punishment that

this Court has and that, although, with that said, the PSR

Paragraphs 56 and 57 describe probation as a possible sentence

due to the defendant's guideline range and guideline zone, and,

therefore, we would respectfully request from the Court that

sentence of probation. Thank you, Your Honor.

THE COURT: Mr. Reidle, could you please stand?

(So done.)

THE COURT: I have now heard argument from both of

the attorneys regarding what they believe the appropriate

sentence is. Before I actually decide the sentence, is there

1  anything that you wish to say?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Okay.  You may proceed.

4           THE DEFENDANT:  To Your Honor and the Court.  I want

5  you to know the feelings of sorrow and regret that I feel.  I

6  know what I did was wrong, and I'm sorry for all that has

7  happened.  I wish that things could be undone, but I know it's

8  not possible.  I know that I should not expect forgiveness from

9  any person or their families affected, but I am truly sorry.

10 All I can do is tell you that I will always be sorry from the

11 bottom of my heart and accept the judgment of this Court in a

12 respectful, right attitude.  Thank you for the Court's time,

13 Your Honor.

14          THE COURT:  Well, sir, when I decide the appropriate

15 sentence, I consider the sentencing guidelines, but I also

16 consider a number of other factors under federal sentencing

17 law, many of which your attorney has mentioned.  Such as your

18 history and characteristics and the nature and circumstances of

19 this offense, the need to promote respect for the law, the need

20 to protect the community, the need to deter others from

21 committing offenses, among a number of other factors, all with

22 a goal of imposing a sentence that I believe is sufficient, but

23 not greater than necessary, to meet the goals of the federal

24 sentencing statute.

25          And as I hope you've gathered through the questions

I've had of the attorneys, this crime is very troubling.  I do believe that this is one of the reasons that we have this law in place.  I haven't seen the form in a while, but in other trials, I have seen the form.  I do believe it very clearly tells individuals that failure to answer the form in a truthful manner will subject you to penalties.

However, I also think that it's important to fashion a sentence that is focused on the specifics of this case, of your particular case, and, I guess, not let the emotion associated with the horrendous events that occurred afterwards have an undue impact on the sentence in this case.  And so that's what I'm really struggling with as I decide the appropriate sentence.

However, through the information in the presentence report and through the information that's been provided to me by the government and by your attorney, I have come to the conclusion that a sentence at the bottom end of the guidelines is appropriate.  And I'm kind of surprised that I'm coming to this conclusion because that was not my intent when I first read the presentence report, but I am convinced that your particular history and characteristics did make you a potential target of Mr. Cross and that he did take advantage of the mental and educational limitations that you have exhibited in order to convince you to fill the form out incorrectly and deceitfully.

1    I also find it of importance and relevance that you

2 were willing to cooperate in the ultimate prosecution, and I do

3 think that you should be given credit for that.

4    And so I am going to impose a sentence within the

5 guidelines, but at the low end of the guidelines, and sentence

6 you to probation for a period of five years.  There are going

7 to be a number of conditions of supervised release -- of

8 probation, excuse me.  One is -- by and large, they were

9 contained on Page 11, Paragraph 63, of the presentence report.

10    One is that you continue to successfully participate

11 in the mental health counseling program as approved by the

12 probation office.

13    Two, that you submit your person, property, house,

14 residence, office, vehicle, papers, computer, and other

15 electronic communications to a reasonable search at a

16 reasonable time, based upon a reasonable suspicion that you

17 have evidence of contraband or have violated the terms of your

18 supervised -- or of your probation.

19    There's a provision that you not consume or possess

20 alcoholic beverages.  I am not going to impose that because I

21 don't see in the presentence report that you have any problems

22 with consumption of alcohol, and I don't see that it -- any

23 issues associated with the consumption of alcohol related to

24 this particular offense.

25    I am going to, however, impose a special condition

1  that you be subject to home confinement for a period of 180

2  days, and I do believe that the guidelines require some type of

3  home confinement.

4          One final reason that I am imposing the sentence,

5  Mr. Reidle, I think it's important that you understand this, is

6  that by imposing probation, the -- I am ensuring that the full

7  range of punishment is still available to me in the event that

8  you violate the terms of your probation.

9          And I want to make it clear to you that I believe

10 that I'm giving you a break, and this is the only break that

11 you're going to receive.  I consider under all circumstances

12 being a straw purchaser to be a very, very serious -- very

13 serious crime, and the outcome in this particular case could

14 not create a more textbook example as to why it's a serious

15 crime.

16         And so, while I've given you a break, this is the

17 only break you're going to be given.  And if there are any

18 violations of your probation, I want you to completely

19 understand that really the only option on the table is going to

20 be revoking your probation and sentencing you to the term of

21 imprisonment that I originally intended to today.

22         Do you have any questions regarding what is expected

23 of you while you're on probation?

24         THE DEFENDANT:  No, Your Honor.

25         THE COURT:  Mr. Kelleher, is there any additional

1  information that the judgment should contain?

2          MS. KELLEHER:  Not that I'm aware of, Your Honor.

3          THE COURT:  Ms. Johns, do you have any specific

4  requests?

5          MS. JOHNS:  No, Your Honor.

6          THE COURT:  Mr. Reidle, you entered into a plea

7  agreement with the government where you gave up your right to

8  challenge this sentence, except under very limited

9  circumstances.  If you choose to exercise your right under

10 those limited circumstances, you may do so, but you have to

11 file a notice of appeal within 14 days of the date of the

12 judgment in this case.  If you do not file a notice of appeal

13 within 14 days, then you will forever lose your right to appeal

14 this sentence.  Do you understand that?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Mr. Kelleher, anything further on the

17 part of the government?

18         MS. KELLEHER:  No, Your Honor.

19         THE COURT:  Ms. Johns, anything on behalf of Mr.

20 Reidle?

21         MS. JOHNS:  No, Your Honor.

22         (The Court conferred with court staff off the

23 record.)

24         THE COURT:  I did forget to put two additional

25 pieces of information on the record.

1          Sir, I am going to waive a fine because I don't

2    believe you have the means to waive pay a fine.  I'm required

3    by law to impose a special assessment in the amount of $100,

4    and payment of that special assessment will be one of the

5    conditions of your probation.

6          Anything else that I may have forgotten?

7          MS. KELLEHER:  No, Your Honor.

8          MS. JOHNS:  No, Your Honor.

9          THE COURT:  Then that will conclude this proceeding.

10         (Hearing adjourned.)

11                    - - -

12                    - - -

13                  CERTIFICATE

14         I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16

17

18    January 27, 2016

19                              /s/_____
                                Kathleen M. Wirt, RDR, CRR
20                              U.S. Court Reporter

21

22

23

24

25